Morris E. MEYER and Toni T. Meyer, husband and wife, and individually; and Link, Inc., a Wyoming corporation, Appellants (Plaintiffs),

v.

Richard J. MULLIGAN, Appellee (Defendant).

Richard J. MULLIGAN, Appellant (Defendant),

v.

Morris E. MEYER and Toni T. Meyer, as husband and wife, and individually; and Link, Inc., a Wyoming corporation, Appellees (Plaintiffs).

Nos. 93–249, 93–260.

Supreme Court of Wyoming.

Jan. 30, 1995.

Patrick M. Hunter, Casper, for Meyers and Link, Inc.

Richard E. Day and Ann M. Rochelle of Williams, Porter, Day & Neville, Casper, for Mulligan.

Before GOLDEN, C.J., and THOMAS, CARDINE,* MACY and TAYLOR, JJ.

CARDINE, Justice, Retired.

This case concerns an agreement between two couples, Rustin and Jolyn Johnson and Morris and Toni Meyer, to purchase a motel in Jackson, Wyoming and to form a corporation to own and operate the motel. The agreement began coming apart when the Meyers were unable to pay their half of the down payment at closing as agreed and, instead, executed a promissory note payable to the Johnsons. The Johnsons, having paid the entire down payment, took title to the motel personally and, soon after, demanded payment on the note. The Meyers refused to pay the note until the motel was assigned to the corporation. The Meyers sued the Johnsons for breach of contract and sued the corporate attorney, employed to form the corporation and create documents to transfer the motel to the corporation, for malpractice. The trial court granted summary judgment to the attorney, concluding: (1) that no attorney-client relationship existed between the corporate attorney and the Meyers; (2) that the attorney had caused no injury to the corporation; and (3) denying the attorney's motion for W.R.C.P. 11 sanctions. Both the attorney and Meyers appeal.

We affirm in part and reverse in part.

## I. ISSUES

In Appeal No. 93–249, appellants Morris and Toni Meyer raise the following issues:

A. Did the trial court err in its finding that there was 1 ɔ issue of fact as to whether the Appellee Mulligan and the Appel-lants Meyers had an attorney-client relationship[?]

B. Did the trial court err in its finding that no issue of fact existed as to whether the Appellee breached his duty to the Appellant Link Inc.[?]

C. Did the trial court abuse its discretion in granting Summary Judgment prior to allowing the Plaintiffs/Appellants to conduct reasonable discovery, including and particularly depositions of the parties?

In Appeal No. 93–260, appellant Richard Mulligan raises one issue:

A. Did the Trial Court Err in Denying Defendant Mulligan's Motion for Sanctions Under Rule 11 of the Wyoming Rules of Civil Procedure?

## II. FACTS

On November 25, 1989, Morris and Toni Meyer (Meyers) and Rustin and Jolyn Johnson (Johnsons), all residents of Louisiana, met and discussed potential investment properties available in Teton County, Wyoming. On December 10, 1989, the Meyers and the Johnsons viewed the Sagebrush Motel (motel) located in Teton County, Wyoming. On that same day, the Meyers contacted Dorothy Mercer (Mercer), the owner of the motel, about purchase terms. Mercer related that she would sell the motel for $775,000.00 with earnest money of $50,000.00, if closing occurred by the first week of January 1990, and if the buyers would tender $325,000.00 as down payment at closing with the remaining to be paid in yearly installments.

The Meyers and Johnsons discussed the proposal, agreed to buy the motel, and to employ a local attorney to form a corporation. The Johnsons and Meyers agreed that the motel would be transferred to the corporation and the Meyers and Johnsons would each own 50 percent of its stock. According to the Meyers, on December 11, 1989, they and the Johnsons met over breakfast and discussed the terms of the agreement between them. The Meyers contend that, at that meeting, the Johnsons agreed to pay the entire down payment at closing and that the

* Retired July 6, 1994.

Meyers would give the Johnsons a note for their half of the down payment.

On December 10, 1989, the Meyers and Johnsons hired Attorney Richard Mulligan (Mulligan) to prepare the necessary legal documents to form the corporation which was to purchase and hold the motel, "to assist in the closing [on the motel,] * * * provide advice and counsel as to the effect of Wyoming law on those transactions and * * * to represent the corporation." Previously, Meyer had retained Mulligan to form a totally separate and unrelated river tubing corporation. On December 12, 1989, the Johnsons paid the $50,000.00 earnest money, which was placed in the trust account of Mercer's attorney.

Mulligan prepared and filed with the Secretary of State articles of incorporation for Link, Inc. (Link). On December 18, 1989, the Secretary of State issued Link a certificate of incorporation. The articles of incorporation named Morris Meyer and Rustin Johnson as the two members of the board of directors and named Mulligan the incorporator and registered agent. On December 14, 1989, Mulligan billed Link $1,750.00 for "[p]reparation of documents for purchase of Sagebrush Motel and Contract for Deed regarding property[,] [p]reparation of Warranty Deed, Quitclaim Deed, Memorandum Of Sale, Same day service [and] incorporation of Link, Inc. of Wyo."

The Johnsons claim that on the date scheduled for closing on the motel, January 5, 1990, at a meeting in Mulligan's office, Mercer's attorney informed the Meyers, the Johnsons, and Mulligan that Mercer would not sell the motel to the Meyers but would sell it to Rustin Johnson individually. After "much discussion" among the Meyers, the Johnsons and Mulligan, the Meyers and Johnsons agreed that Rustin Johnson would take title to the motel individually, then assign his rights and obligations under the contract to Link and that the Meyers would contribute equally through Link.

Then, also according to the Johnsons, after this change in the manner of purchase, the Meyers, for the first time on January 5, 1990, informed the Johnsons that they did not have funds available in Wyoming to pay their half of the down payment. After learning about the Meyers' lack of funds, the Johnsons claim that Mr. Meyer suggested that "the Johnsons remit the entire amount of down payment ($375,000.00) and that the Meyers would execute a promissory note for one half of this down payment"; that the parties discussed the proposition and Mulligan explained the different types of notes and their consequences. Mulligan then drafted the note, and the Meyers executed it.

Later, on January 5, 1990, Mercer and Rustin Johnson closed on the sale of the motel. At the same time, Rustin Johnson and Mercer executed an agreement, prepared by Mulligan (Assignment and Guarantee), which was personally guaranteed by Rustin Johnson, and granted Johnson the right to assign the contract for deed to Link.

On January 7, 1990, the Meyers paid the Johnsons $1,125.00 for half of Mulligan's fees and for the initial capitalization of Link. On January 18, 1990, Morris Meyer faxed Mulligan a letter requesting a copy of the demand note and expressing dismay that he had not "seen any writings indicating an effort to place the [motel] and business into [Link]." That same day, Mulligan faxed the Meyers a reply with a copy of the demand note attached. In that reply, Mulligan explained to the Meyers the nature of a contract for deed transaction, informed the Meyers "[e]verything has been done to protect you in this matter" and that the motel sales contract had been assigned to Link by Rustin Johnson in the assignment and guarantee document.

On February 16, 1990, the Johnsons orally demanded payment of the note. The Meyers refused to pay the note. On March 2, 1990, after receiving a letter from the Meyers stating their position, the Johnsons wrote the Meyers explaining that Rustin Johnson owned 100 percent of the rights and obligations under the motel sales contract and indicating that they did not intend to assign those rights to Link. Along with that letter, the Johnsons enclosed a check for $1,125.00, the amount the Meyers had paid toward attorney fees and capitalization of Link. Meanwhile, on February 26, 1990, the Johnsons had written Mulligan a letter explaining

that the Meyers had refused to honor their demand for payment of the note, documenting the deteriorating relationship between the couples, and seeking advice from Mulligan clarifying the rights, duties and obligations of the Meyers, Johnsons, and Link.

On January 9, 1992, the Meyers sued the Johnsons, in their individual capacity and as officers of the corporation for Link for breach of contract and sued Mulligan for malpractice. In their complaint, the Meyers allege that the Johnsons breached their agreement by failing to assign the motel contract to Link and that Mulligan was negligent and had breached the contract retaining him by failing to draft the legal documents to reflect the parties' agreement. On August 6, 1992, after the Johnsons and Mulligan had answered and after answering interrogatories, Mulligan moved for summary judgment and for sanctions against the Meyers under W.R.C.P. 11.

On August 20, 1993, the trial court granted Mulligan summary judgment against the Meyers personally, finding no attorney-client relationship between the Meyers and Mulligan and against Link, finding that Mulligan did not cause injury to Link. In addition, the trial court granted summary judgment to the Meyers on Mulligan's claim for sanctions. On August 25, 1993, the Meyers moved the trial court to reconsider the summary judgment order and attached a deposition of Mulligan which was taken for purposes of establishing minimum contacts with the state of Louisiana involving a suit filed by the Meyers against Mulligan in Louisiana.[1] On October 26, 1993, the trial court issued an order denying the Meyers' motion for reconsideration. The Meyers appeal the grant of summary judgment to Mulligan on the personal and the corporate claim, and Mulligan appeals the denial of W.R.C.P. 11 sanctions.

## III. DISCUSSION

### A. STANDARD OF REVIEW

A grant of summary judgment will be affirmed "when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law." *Moore*

v. Lubnau, 855 P.2d 1245, 1248 (Wyo.1993) (quoting Zmijewski v. Wright, 809 P.2d 280, 282 (Wyo.1991)). When reviewing a grant of summary judgment, we look at the record in the "light most favorable to the party opposing the motion" and give to that party "all favorable inferences that can be drawn from the facts." *Id.* (quoting Clark v. Industrial Co. of Steamboat Springs, Inc., 818 P.2d 626, 628 (Wyo.1991)).

### B. ATTORNEY–CLIENT RELATIONSHIP

■ In most claims of legal malpractice it is essential to establish an attorney-client relationship. *Brooks v. Zebre,* 792 P.2d 196, 201 (Wyo.1990); *see also Bowen v. Smith,* 838 P.2d 186, 198 (Wyo.1992) (Brown, J., concurring). The attorney-client relationship is necessary because it creates a professional duty on the part of the attorney. *Skarbrevik v. Cohen, England & Whitfield,* 231 Cal. App.3d 692, 282 Cal.Rptr. 627, 632 (1991); *Warmbrodt v. Blanchard,* 100 Nev. 703, 692 P.2d 1282, 1285 (1984); *Goerlich v. Courtney Industries, Inc.,* 84 Md.App. 660, 581 A.2d 825, 827 (1990). In very limited situations, some courts have imposed a professional duty on attorneys even though there was no attorney-client relationship. *See discussion, Brooks,* 792 P.2d at 201; *see also Skarbrevik,* 282 Cal.Rptr. at 632–33 and *Goerlich,* 581 A.2d at 827. The Meyers, however, base their claim solely on a duty allegedly created through the existence of an attorney-client relationship with Mulligan.

■ Determining the existence of an attorney-client relationship "depends on the facts and circumstances of each case" and "may be implied from the conduct of the parties, such as the giving of advice or assistance, or such as failing to negate the relationship when the advice or assistance is sought if the attorney is aware of the reliance on the relationship." *Chavez v. State,* 604 P.2d 1341, 1346 (Wyo.1979), *cert. denied* 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). The determination of whether there is an attorney-client relationship is one of

---

1. The Meyers had failed to establish minimum contacts, and the Louisiana court dismissed their action against Mulligan. Thereafter, the Meyers filed this suit in Wyoming.

fact and, typically, is for the trier of fact and cannot be resolved by summary judgement. 2 R.E. Mallen and J.M. Smith, *Legal Malpractice* §§ 27.10, 27.22 (3d ed. 1989).

■ In a Formal Opinion, the American Bar Association addressed the question: "When does a partnership's lawyer have an attorney-client relationship with an individual partner?". That opinion suggested:

> Whether such a relationship has been created almost always will depend on an analysis of the specific facts involved. The analysis may include such factors as whether the lawyer affirmatively assumed a duty of representation to the individual partner, whether the partner was separately represented by other counsel when the partnership was created or in connection with its affairs, whether the lawyer had represented an individual partner before undertaking to represent the partnership, and whether there was evidence of reliance by the individual partner on the lawyer as his or her separate counsel, or of the partner's expectation of personal representation.

ABA Standing Comm. on Ethics and Professional Responsibility, Formal Opinion 91–361 (1991). These factors are relevant to and offer guidance in the determination of when a closely-held corporation's attorney has established an attorney-client relationship with one of the corporation's incorporators, shareholders, or managers because partnerships and closely-held corporations combine many similar characteristics. *See generally* 1 O'Neal & Thompson, *O'Neal's Close Corp.* § 1.08 (3rd ed. 1991–1994) and Lawrence E. Mitchell, *Professional Responsibility and the Close Corporation: Toward a Realistic Ethic,* 74 Cornell L.Rev. 466, 468–69 (1989).

Also bearing on this case is the entity rule, *i.e.,* "[a]n attorney who represents a corporation does not, because of that corporate representation, also represent the individual stockholders[, officers or directors]." *Bowen,* 838 P.2d at 197 (Brown, J., concurring) (*citing Skarbrevik,* 282 Cal.Rptr. at 634); *Bowen,* 838 P.2d at 195 (rule stated in majority opinion); see also *Robertson v. Gaston Snow & Ely Bartlett,* 404 Mass. 515, 536 N.E.2d 344, 348 (1989) (*citing* 1 R.E. Mallen

& J.M. Smith, *Legal Malpractice* § 7.6 (3d ed. 1989)). In addition, Rule 1.13(a) of the Wyoming Rules of Professional Conduct provides:

> (a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

Thus, "the duty of the corporate attorney is to his client—the corporate entity." *Bowen,* 838 P.2d at 195, (*citing* Brooke Wunnicke, *Ethics Compliance for Business Lawyers* § 8.2 (1987)).

It should be noted that the "entity rule" has been criticized as unworkable when applied to the representation of closely-held corporations. Lawrence E. Mitchell, *Professional Responsibility and the Close Corporation: Toward a Realistic Ethic,* 74 Cornell L.Rev. 467, 469–72 (1989). Unlike representing large publicly-held corporations, when representing the traditional closely-held corporation—where all the shareholders are also the managers of the corporation—it is very difficult to distinguish the entity from the shareholders and, therefore, difficult to determine who is the client. *Id.*

To whom an attorney hired to form a corporation owes a professional duty is not settled. Wunnicke, at § 8.4. One commentator has written:

> [P]reparation of articles of incorporation and bylaws may be a routine task, * * * but the lawyer-client relationship in the course of organizing a corporation is complex.
>
> &ast;   &ast;   &ast;   &ast;   &ast;   &ast;
>
> * * * The appealing reality is that often the lawyer who is organizing a corporation is representing the group. Hence, absent an actual conflict of interest or patent unfairness to a member of the group, the same ethical rules that apply to representing the corporate entity should apply to the group who are the incorporators.

Wunnicke, at §§ 8.4 and 8.5. An Illinois Appeals Court reached this same conclusion when it stated:

> In setting up a corporation, an attorney would represent the incorporators, *not* the

person who might later buy shares in the corporation.

*Michel v. Gard,* 181 Ill.App.3d 630, 130 Ill. Dec. 164, 170, 536 N.E.2d 1375, 1381 (1989) (dismissal affirmed in an action where a shareholder in a closely-held corporation sued the attorney hired to form the corporation for malpractice, in part, because it found no attorney-client relationship between the shareholder and the attorney hired by the incorporators).

In a treatise on close corporations, the authors suggest that an attorney retained to form a corporation represents each of the incorporators, when they write:

> When an attorney is asked to represent prospective shareholders (if more than one) in organizing a close corporation, or when the attorney is later asked to represent all the shareholders in preparing a shareholders' agreement or any document affecting corporate control or the transfer of shares, he should discuss with them possible conflicts of interests and let each participant decide if he wants the attorney to serve as his counsel.

1 *O'Neal's Close Corp.* § 2.02.

Our analysis begins by noting that the Meyers contend that a genuine issue of fact exists concerning the existence of an attorney-client relationship between them and Mulligan because Mulligan had previously represented the Meyers; because Mulligan advised the Meyers in a letter concerning their query about the status of the corporation; and Mulligan stated in his deposition that his representation "involved [the] Meyers, * * * Johnsons and the corporation Link, Inc."

It is undisputed that Mulligan

> was retained to prepare the legal documents necessary to form Link, Inc. as well as the Contract for Deed to provide for the purchase of the Sagebrush Motel by Rustin D. Johnson with a provision in that contract whereby Rustin D. Johnson had the right to assign that contract for purchase to Link, Inc. as long as Rustin D. Johnson personally guaranteed payment of the purchase price to the sellers.

It is also undisputed that Mulligan incorporated Link, drafted documents for the purchase of the motel by Link and billed those services to Link; and then, because the Meyers and the Johnsons decided to change the agreement for the purchase of the motel, Mulligan prepared the demand note for one half of the motel's down payment payable to the Johnsons from the Meyers and prepared the "Agreement to the Assignment of Real Estate Sales Contract and Personal Guarantee."

■ Based on the facts, it is not clear who Mulligan represented. When Mulligan was retained, Link did not exist; instead, he was hired by both the Johnsons and Meyers to create Link, as well as draft documents for the purchase of the motel. Based on that fact alone, it could be argued that Mulligan represented both the Johnsons and Meyers and, therefore, owed each a professional duty. Also, it is not clear from this record what occurred at the meeting between Mulligan, the Meyers and the Johnsons on the day of the motel closing. Did the Meyers and Johnsons agree, by themselves, to change the purchase process and simply have Mulligan act as a scrivener or did Mulligan advise both couples as to the best way to accomplish their goals? The Johnsons' "Answers to Interrogatories" suggest that Mulligan offered continuing advice to both the Meyers and the Johnsons throughout the entire transaction.

The limited evidence in this record is not so conclusive that reasonable persons would not differ concerning the question of the existence of an attorney-client relationship between the Meyers and Mulligan. Since the record is devoid of the specifics of any conversation concerning representation, we cannot discern whether Mulligan disclaimed representation of the Meyers or if the Meyers' claimed reliance is valid. Therefore, we hold that a genuine issue of material fact remains concerning the existence of an attorney-client relationship between the Meyers and Mulligan.

There is no dispute that an attorney-client relationship existed between Mulligan and Link, the corporation, and that Mulligan owed Link a professional duty. Therefore, we must next determine whether Mulligan

was entitled to summary judgment because the undisputed facts demonstrate that Mulligan did not breach his duty to the Meyers or to Link.

## C. BREACH OF DUTY AND CAUSATION

The Meyers contend that summary judgment was improper because *Moore,* 855 P.2d 1245, requires that Mulligan present expert evidence as to the standard of care required of an attorney and that he failed to do so, and that the trial court improperly acted as the expert in setting the applicable standard of care when it granted summary judgment against Link. In *Moore,* we stated that an attorney-defendant moving for summary judgment in a legal malpractice action must make a prima facie showing of the absence of legal malpractice. *Moore,* 855 P.2d at 1248. Additionally, we held that the elements in a legal malpractice case are: "(1) the accepted standard of [legal] care or practice, (2) that the [lawyer's] conduct departed from the standard, and (3) that [the lawyer's] conduct was the legal cause of the injuries suffered." *Moore,* 855 P.2d at 1248 (*citing Metzger v. Kalke,* 709 P.2d 414, 421 (Wyo.1985)). Therefore, it was Mulligan's burden, as the movant, to make a showing of undisputed material facts with respect to these elements and that he was entitled to judgment as a matter of law.

■■ Concerning elements (1) and (2), Mulligan, as the movant, "was required to demonstrate that his conduct conformed to the accepted standard of legal care." *Moore,* 855 P.2d at 1248. In most legal malpractice cases, the establishment of the standard of care can be accomplished only through expert testimony. *Id.,* at 1249. However, "[a]n exception exists * * * when a lay person's common sense and experience are sufficient to establish the standard of care." *Id.* This is not a case which fits that exception, however; and because Mulligan, in his motion for summary judgment, did not include any expert evidence as to the applicable standard of care, he failed to make a prima facie showing that his conduct conformed to the accepted standard of care.

■■ Next, we must determine whether Mulligan made a prima facie showing that there were no disputed material facts concerning causation and that, as a matter of law, his conduct was not the legal cause of Link's damages. In both medical and legal malpractice actions, as in all negligence cases, the plaintiff must prove that the breach of the standard of care was both the cause in fact and the proximate cause of the injury. *Harris v. Grizzle,* 625 P.2d 747, 753 (Wyo.1981), and *see Moore,* 855 P.2d at 1248 (stating that the elements of legal malpractice mirror those of medical malpractice as designated in *Harris*). In medical malpractice cases we require expert opinion to prove proximate cause. *Harris,* 625 P.2d at 753 (*citing Keller v. Anderson,* 554 P.2d 1253 (Wyo.1976)). We have not decided whether expert evidence is required in legal malpractice cases to prove causation.

■ "[I]n the vast majority of legal malpractice actions in which expert testimony is required, the plaintiff must establish through expert testimony *not only* the applicable standard of care and the breach of that standard, *but also* that the alleged breach of the standard of care was the proximate cause of his injury." Dennis J. Horan and George Spellmire Jr., *Attorney Malpractice: Prevention and Defense* at 13.6 (1987); *see also* 2 R.E. Mallen & J.M. Smith *Legal Malpractice* §§ 27.14, 27.15, 27.22 and *Jarman v. Hale,* 112 Idaho 270, 273, 731 P.2d 813, 816 (App.1986). The reasoning for requiring expert evidence to prove the standard of care is because "lay people are not competent to pass judgment on legal questions." *Moore,* 855 P.2d at 1249. That same reasoning supports requiring expert testimony concerning proximate cause in this case. Whether Mulligan could have drafted the documents differently so that this dispute and its damaging effects would have been avoided is not a question that lay people could competently determine. Therefore, in this case, expert evidence is necessary to prove proximate cause, and Mulligan was required to provide expert evidence on the lack of proximate cause to succeed at summary judgment.

■ Because Mulligan's motion for summary judgment failed to include expert evi-

dence showing that his alleged breach was not the proximate cause of Link's or the Meyers' injury, he was not entitled to summary judgment as against either.

### D. W.R.C.P. 11 SANCTIONS

In Appeal No. 93–260, Mulligan contends that the trial court abused its discretion when it refused to impose sanctions under W.R.C.P. 11. Mulligan argues that because the Meyers neglected to consult an expert concerning the standard of care before filing the malpractice claim against him, they failed to make "reasonable inquiry," which, under Rule 11, is certified as being made when the complaint is signed.

▮▮▮▮ Rule 11 provides, in relevant part:

(a) *Signing of pleadings.*—Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address and telephone number shall be stated and who shall be a member of the Wyoming State Bar. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. *The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.* If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed

promptly after the omission is called to the attention of the pleader or movant. *If a pleading, motion, or other paper is signed in violation of this rule, the court, upon a motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction,* which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

(Emphasis added.) We affirm a ruling concerning W.R.C.P. 11 sanctions unless it is demonstrated that the trial court abused its discretion. *L.C. v. T.L.,* 870 P.2d 374, 381 (Wyo.1994). A trial court abuses its discretion if it acts outside the bounds of reason under the circumstances and we determine that it could not have reasonably concluded as it did. *Id.*

▮▮▮▮ Because Wyoming's Rule 11 parallels Rule 11 in the Federal Rules of Civil Procedure, federal precedent offers able guidance in review of decisions concerning Rule 11. Concerning the purpose of Rule 11, the United States Supreme Court has stated:

It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts.

*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990). The federal courts uniformly apply an objective test—reasonableness under the circumstances—to determine whether the Rule 11 duty of a "reasonable inquiry" has been satisfied. Georgene M. Vairo, *Rule 11 Sanctions* §§ 5.01, 5.02(b) at 5–3, 5–10 (2d ed. 1993); Charles A. Wright & Arthur R. Miller, 5A *Federal Practice and Procedure: Civil 2d* § 1335 at 59–60 (1990); *see, e.g., Burkhart through Meeks v. Kinsley Bank,* 804 F.2d 588, 589–90 n. 3 (10th Cir.1986). We adopt that objective standard for determining whether "reasonable inquiry" has been made. Thus, the question we must answer is, could the district court have reasonably concluded that the Meyers' attorney

acted as a reasonably competent attorney when he inquired into the facts and law and filed this malpractice complaint against Mulligan.

Mulligan would have this court hold that one who files a legal malpractice action, where expert evidence will be required, must consult with an expert before filing the action or be subject to sanctions under Rule 11. We agree that before an attorney files a legal malpractice action where the underlying case of alleged malpractice involves a complex or specialized area of the law, with which they are unfamiliar, that attorney should first consult with an expert in the complex or specialized legal arena about the standard of care. *See generally* Vairo § 6.03(g) at 6–53. That is not the case here, however, where the underlying case of alleged malpractice involves drafting documents to form a corporation and the transfer of real property.

Since the practice of Meyers' attorney involves "business planning and real estate," it was not necessary for him to consult an expert in order to make the "reasonable inquiry" required by Rule 11. Because Mulligan rests his claim for sanctions solely on the Meyers' attorney's failure to consult an expert before filing, we hold that the district court did not abuse its discretion in refusing to impose Rule 11 sanctions against the Meyers.

### IV. CONCLUSION

Viewing the record in the light most favorable to the Meyers, we conclude that: (1) genuine issues of material fact remain concerning whether an attorney-client relationship existed between the Meyers and Mulligan; (2) Mulligan failed to meet his burden of demonstrating the absence of a prima facie case of legal malpractice; and (3) the district court properly denied sanctions against the Meyers. Therefore, we reverse the district court's order granting summary judgment but affirm its order denying sanctions.

Reversed in part and affirmed in part.

GOLDEN, Chief Justice, concurring, joined by MACY, J.

While I concur in the decision to reverse the trial court's entry of summary judgment, I write separately to express my concerns with that court's entry of summary judgment on a ground different from that pursued by the movant (Mulligan), and with this court's review of materials not before the trial court on the original motion for summary judgment.

Mulligan originally sought summary judgment contending that because the Meyers had failed to produce expert testimony concerning Mulligan's breach of duty, they had not presented facts sufficient to raise a genuine question of his negligence. In support of his motion for summary judgment, Mulligan attached a copy of the Meyers' answers to interrogatories. These materials were submitted to support Mulligan's contention that no genuine question of fact existed concerning the breach of duty issue.

The Meyers opposed Mulligan's motion for summary judgment, submitting with that response two affidavits, one by their attorney attesting to his good faith belief that Mulligan had breached his duty and the other by Mr. Meyers attesting to his belief that Mulligan had undertaken to represent the Meyers' interests and had failed in his efforts. They also submitted two letters between the parties concerning the transaction in question.

Mulligan's motion for summary judgment did not seek judgment on the ground that no genuine issue of fact existed concerning the existence of an attorney-client relationship, and neither party submitted materials concerning the question whether that relationship existed. Nonetheless, this is the ground upon which the trial court awarded summary judgment to Mulligan. Only upon the Meyers' motion for reconsideration, was the trial court presented with materials concerning the existence of an attorney-client relationship between the Meyers and Mulligan.

The Meyers filed a motion for reconsideration, to which they attached two letters and a transcript of Mulligan's deposition taken in a different state, the thrust of which deposition was to establish his minimum contacts with that state. In their motion for reconsideration, the Meyers pointed out that they were unaware the court was considering the ques-

tion whether an issue of fact existed concerning the existence of the attorney-client relationship. They urged the court to allow them more time to conduct discovery to obtain the information necessary to demonstrate the existence of a genuine issue of material fact concerning the existence of the relationship.

Mulligan responded to the motion for reconsideration, but submitted no additional materials for the court's consideration. The trial court ruled on the motion for reconsideration as follows:

This court has read the additional material submitted by plaintiffs in support of their motion for reconsideration, but fails to find in the supporting material any admissible evidence which would alter the decision already entered by this Court. * * * If the Court assumes for a moment that counsel for plaintiffs failed to discover the issue of whether there was an attorney-client relationship between Mulligan and the plaintiffs individually, such that the decision of this Court came as a total surprise, it remains readily apparent, that after receiving the decision letter of the Court and having scrounged up everything that he had to try to raise a question of fact on this issue, it still is simply not there.

I cannot condone the trial court's disposition of the motion for summary judgment in this fashion. Our rules governing summary judgment provide a definite procedure to be followed by the movant, the party opposing the motion and the trial court. Wyo.R.Civ.P. 56.

The rules contemplate one party will move for summary judgment on the ground that the absence of any genuine issue of fact concerning a particular material allegation in the pleadings entitles him to judgment as a matter of law. Rule 56(c) requires the motion and supporting proof to be served at least ten days before the hearing on the motion. This provides the party opposing the motion with notice of the material allegation at issue and the proof to which he must respond. Wyo.R.Civ.P. 56.

Following submission of all materials by the parties, the trial court's task is two-fold.

The trial court must first determine whether a genuine issue of fact exists concerning the material allegations in question. If the trial court determines no genuine issue of material fact exists concerning the material allegation, it must next determine whether in light of that absence the moving party is entitled to judgment as a matter of law.

In this case, Mulligan moved for summary judgment alleging no genuine issue of fact existed concerning a material· allegation of the complaint—breach of duty. Mulligan submitted his motion and supporting proof within the prescribed time period. The Meyers responded to the particular allegation set forth in Mulligan's motion and to the materials attached to his motion.

This court has commented:

The Rules of Civil Procedure provide an orderly process for the determination of controversies. They are intended to provide notice to a party of the other's contentions, a fair opportunity to discover and develop the entire case and meet those contentions, and to avoid surprise—all to the end that a just result is more probable.

*Larsen v. Roberts,* 676 P.2d 1046, 1048 (Wyo. 1984) (reversing portion of summary judgment entered in reliance upon late-filed affidavits); *Hickey v. Burnett,* 707 P.2d 741, 744 (Wyo.1985) (reversing summary judgment entered in reliance upon materials never filed).

The trial court strayed from its task of answering the questions presented by Mulligan's motion for summary judgment—whether a genuine issue of material fact existed concerning Mulligan's breach of duty, and, if not, whether Mulligan was entitled to judgment as a matter of law. This deprived the Meyers of notice and a fair opportunity to conduct discovery and respond to the motion.

I would limit this court's review to the motion for summary judgment as originally presented to the trial court, and I agree with the majority's disposition of that issue. I would not address the question whether a genuine issue of material fact exists concerning the existence of an attorney-client relationship. When this court reviews a motion for summary judgment, it has exactly the

same duty as the trial court and considers the question in the same light as the trial court. *Four Nines Gold, Inc. v. 71 Constr., Inc.,* 809 P.2d 236, 238 (Wyo.1991). The question of the existence of an attorney-client relationship was not properly before the trial court and is thus not properly before this court.