2002 WY 43

Steven Matthew BEVAN; Steven Tyler Bevan, a minor through his next friend, Steven Matthew Bevan; and Brittany Bevan, a minor through her next friend, Steven Matthew Bevan, Appellants (Plaintiffs),

v.

William R. FIX, Appellee (Defendant).

No. 00–199.

Supreme Court of Wyoming.

March 21, 2002.

Robert E. Schroth, Jackson, WY, Representing Appellants. Argument by Mr. Schroth.

Stephen H. Kline of Kline Law Office, P.C., Cheyenne, WY, Representing Appellee. Argument by Mr. Kline.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ., and SPANGLER, D.J., Ret.

LEHMAN, Chief Justice.

[¶ 1] Appellant minors, Brittany Bevan and Steven Tyler Bevan (Brittany and Steven) appeal, through their father and next friend Steven Matthew Bevan (Bevan), from the district court's grant of summary judgment in favor of appellee William R. Fix (Fix) on their claims of intentional infliction of emotional distress. Having determined that the record reveals genuine issues of material fact sufficient to preclude summary judgment for the appellee on either child's claim, we reverse.

[¶ 2] After addressing the scope of the duty an attorney owes former clients, however, we affirm the district court's grant of summary judgment in favor of appellee Fix on appellant Bevan's claim of legal malpractice. Affirmed in part, reversed in part, and remanded.

### ISSUES

[¶ 3] Appellants present two issues for review:

I. Did the District Court err in granting defendant's Motion for Summary Judgment because genuine issues of material fact existed to support the Plaintiff's Second Cause of Action for Intentional Infliction of Emotional Distress[?]

II. Did the District Court err in granting defendant's Motion for Summary Judgment because genuine issues of material fact existed to support the Plaintiff's Fourth Cause of Action for Legal Malpractice[?]

*FACTS AND PROCEDURAL HISTORY*

[¶ 4] Pursuant to our standard of review for summary judgments, the recitation of facts is from the vantage point most favorable to the plaintiffs, as the parties opposing the motions, awarding them all favorable inferences that may be drawn from the facts. *S & G Investors, LLC v. Blackley*, 994 P.2d 941, 943 (Wyo.2000).

[¶ 5] Defendant William Fix is an attorney licensed to practice law in the state of Wyoming with an office in Jackson. In July of 1992, Bevan hired Fix to represent him as defense counsel on a charge of criminal battery for family violence against his then girlfriend Jenni Jones (Jones). Fix represented Bevan throughout the course of those proceedings, which ultimately ended in a plea agreement. In December of 1994, Bevan and Jones married. Brittany and Steven are the couple's biological children. Brittany was born in August of 1991, Steven in April of 1994.

[¶ 6] In January of 1997, Jones, represented by Fix, filed a complaint for divorce from Bevan. Bevan was not consulted in regard to Fix's representation of his wife Jones nor did he consent to the representation. Subsequently, in June of 1997, Fix withdrew from representation of his client Jones because he had begun a sexual rela-

tionship with her. Bevan further alleges that during the course of the couple's divorce proceedings Fix, upon hearing a rumor that Bevan was going to file a lawsuit against him, phoned Bevan and threatened, "if I messed with him he would bury me."[1] Bevan and Jones' divorce was finalized in December of 1997.

[¶ 7] The facts that relate to the Bevan children's claims are as follows. On the evening of March 29, 1998, Jones and her children Brittany and Steven, as well as two teenage babysitters, were invited to Fix's home to spend the night.[2] Jones and Fix left the children in the care of the babysitters and spent the evening drinking in a local bar with various others. After returning to Fix's home, the following events took place over the course of the night and the subsequent morning.

[¶ 8] It appears from the record that everyone present agrees that Fix, Jones, and at least two other guests continued drinking and that eventually four adults, including Fix and Jones, were soaking in Fix's hot tub. At some point while in the hot tub, a verbal altercation between Fix and Jones escalated into physical violence. Over the next several hours, this pattern of verbal and physical conflict between the two continued, culminating in the violent physical confrontation that forms the basis for the Bevan children's tort claims.

[¶ 9] According to the affidavit of Jones:[3]

In the early morning hours of March 30, 1998, I was awoken from my sleep by Bill Fix who was in the process of throwing me out of the bed. I landed flat on my back on the floor. I tried to sit up several times and he kept pushing me to the floor. He then grabbed my head and started violently banging it against the wall. At the same time that he was banging my head against the wall he was kicking and punch-

---

1. Fix admits in deposition testimony that he phoned Bevan because he heard that Bevan was going to sue him. However, his version of the call is omitted from the record on appeal. Therefore, we are unable to include herein any opposing description of the conversation from Fix.

2. Defendant Fix's filed *Memorandum in Support of his Motion for Summary Judgment* asserts that Fix and Jones were under court order to have no contact with each other at the time.

3. This affidavit is substantially similar to a sworn complaint for family violence protection order filed by Jenni Jones against William Fix on March 31, 1998.

ing me. Although I was barely conscious at this time, I could see my blood spattered on the wall. I finally got free of Fix and made it into the bathroom to call my brother and 911. I was terrified and confused and didn't know what else to do. Fix hung up the phone and screamed he was going to 'kill' me several times. Fix then started punching and kicking me again. I managed to get to the phone again and call 911 a second time and was told that help was on the way. Fix then broke into the bathroom and drug me by my hair out of the bathroom, out of the bedroom and out into the hallway. I believe that I lost consciousness briefly. The next thing I remember is Fix holding me up in the air against the wall, at the top of the stairs, with his hands around my neck, choking me, banging my head against the wall, and him screaming incoherently.

I thought I was going to die at that moment and as I turned my head to the side I saw my three year old son looking at me in absolute horror. I will never forget the fear and horror I saw in his face. Fix then looked at my son Steven Tyler Bevan and said "it's okay sweetie, go back to bed." Steven then ran down the stairs and Fix threw me to the floor and kicked me one more time. As I was being thrown to the floor and kicked again I saw my daughter and the two babysitters, Michelle and Chelsey standing down the hallway also watching. Shortly thereafter the Sheriff's Deputies arrived.[4]

Both Fix and Jones were arrested at the scene; and, in the course of the investigation, police reports were generated which contain interviews with those witnesses present.

[¶ 10] Relatively soon after these events, Steven began "acting out" in preschool. His angry behavior included swearing and choking his classmates. Brittany reportedly had difficulty sleeping and was experiencing nightmares. Both Steven and Brittany began seeing a counselor for their behaviors; and, although the counselor "felt like both kids were, had been impacted by, in a nega-

tive way by witnessing this violence," he concentrated on Steven, believing that Brittany was "very quiet and seemed to be kind of, either seemed to be dealing with this better or at least in a different way than Steven." The counselor, following consultation with Steven's parents, caretakers, and teachers, diagnosed Steven as suffering from post-traumatic stress disorder (PTSD). Some months later, the children began seeing a second counselor in the same facility. This second counselor also diagnosed Steven as suffering from PTSD and, in addition, diagnosed Brittany as suffering from "dysthmic disorder," a form of depression. At the time summary judgment was granted, both children continued to see the second counselor therapeutically.

[¶ 11] In addition, a clinical psychologist who specializes in treating children has evaluated Brittany and Steven. According to her deposition testimony, this psychologist disclosed that Brittany has been very depressed and, while being interviewed, admitted continued suicidal feelings, including a specific incident in the summer of 1998. The psychologist flatly stated, "I think that these children are in significant distress. I'm quite worried about both of them."

[¶ 12] In March of 2000, defendant Fix moved for summary judgment on all of the plaintiffs' claims. The plaintiffs opposed this motion through memorandum supported by deposition testimony and affidavit. Following a hearing on April 10, 2000, the district court entered its order granting summary judgment to Fix on all claims. This timely appeal on the claims of intentional infliction of emotional distress and legal malpractice followed.

### STANDARD OF REVIEW

[¶ 13] Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, reveals that no genuine issues of material fact exist and the prevailing party is entitled to

---

4. According to his deposition testimony, Fix's version of events is essentially that Jones was the aggressor and instigator of the physical confrontation and that the physical contact between the

two was much more mutually combative. He denies hitting Jones or banging Jones' head into a wall and rather describes the events in the hallway as a hair-pulling contest.

judgment as a matter of law. *Worley v. Wyoming Bottling Co., Inc.,* 1 P.3d 615, 620 (Wyo.2000); *Terry v. Pioneer Press, Inc.,* 947 P.2d 273, 275 (Wyo.1997); *Davis v. Wyoming Medical Center, Inc.,* 934 P.2d 1246, 1250 (Wyo.1997); W.R.C.P. 56(c). A fact is material if it establishes or refutes an essential element of a claim or defense. *Tidwell v. HOM, Inc.,* 896 P.2d 1322, 1324 (Wyo.1995). In evaluating summary judgment, we apply the same standards as the trial court, without affording any deference to the trial court's decisions on issues of law. *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211, 216 (Wyo.1994).

## DISCUSSION

### Intentional Infliction of Emotional Distress

[¶ 14] In *R.D. v. W.H.,* 875 P.2d 26, 32 (Wyo.1994), this court expressly adopted the third party intentional infliction of emotional distress cause of action found in *Restatement, Second, Torts,* § 46(2) (1965). This subsection provides:

> (2) Where such [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm.

Thus, one claiming injuries for emotional distress caused by outrageous conduct under § 46(2)(a) must show:

1) that the conduct was "extreme and outrageous";

2) that such conduct was directed at a third person;

3) that the claimant is a member of the immediate family of the third person;

4) that the claimant was personally present when the extreme and outrageous conduct took place; [5]

5) that the claimant sustained severe emotional distress as a result of that conduct (whether or not the claimant sustained bodily harm); and

6) that the person whose conduct is complained of "intentionally" or "recklessly" caused severe emotional distress to the claimant.

[¶ 15] In its application of the *Restatement* provision to the instant case, the district court premised its grant of summary judgment to defendant Fix on the Bevan children's claims of intentional infliction of emotional distress on the first enumerated element. The court concluded that defendant Fix's conduct was not extreme and outrageous as a matter of law, and thus granted summary judgment to him on that basis. The court determined:

> [T]his case involves one isolated altercation. There was no continuing course of abuse of either Jenni or the children, and under the circumstances the conduct the children saw, although deplorable, is not sufficient to support the Plaintiffs' claim.
>
> > Disputes over boundary lines, over the cause of motor vehicle collisions, or over a multitude of real or imagined wrongs, are likely to cause tempers to flare; words (vulgar and otherwise) to be uttered in anger; fists—or anything else handy—to be shaken; and *assaults to occur.* Such happenings are wholly unplanned, spur-of-the-moment occurrences; unfortunately, they occur all too frequently. But we cannot say that the brief outbursts constitute "extreme and outrageous" conduct. *Wiehe v. Kukal,* 225 Kan. 478, 592 P.2d 860, 864 (1979) (emphasis added) [6]

---

5. This court in *R.D. v. W.H.* recognized and applied *Restatement,* cmt. l and the caveat, to this requirement as discussed *infra.*

6. The district court's reliance on the cited case is misplaced. It is clear upon a thorough reading of the opinion that when the Kansas court used the term "assault," it was referring to tortious, rather than criminal, assault. *Wiehe v. Kukal,* 225 Kan. 478, 592 P.2d 860 (1979). It described Wiehe's alleged conduct as "a spontaneous verbal outburst, profane and disparaging, coupled with an assault upon Kukal, upon Wiehe's discovery that Kukal and Hattley were fencing part of Wiehe's land in with their own." *Id.* at 863.

Such unfortunate occurrences occur all too often between intimates and are properly the subject of criminal and injunctive relief. However, not every domestic altercation constitutes extreme and outrageous conduct or results in sufficiently severe emotional impact to support a third party claim. Absent a showing of exceptional circumstances, such as a continuing course of abuse and facts showing severe emotional distress to those third party claimants as a result of what they witnessed, such an altercation will not support a claim for intentional infliction of emotional distress. Summary judgment, therefore, is properly granted on this claim as well.

We disapprove the above reasoning of the district court and its application of the *Restatement* provisions to the facts of this case for the following reasons.

[¶ 16] First, no language in *Restatement* § 46 or its accompanying illustrations indicates that "a continuing course of abuse" rather than a single "isolated altercation" is required before an actor is subject to liability for intentional infliction of emotional distress. In fact, none of the *Restatement* section's twenty-two illustrations, culled from actual cases, constitute a continuing course of conduct; rather, *all* involve isolated incidents. For example:

> *Illustration 1:* As a practical joke, A falsely tells B that her husband has been badly injured in an accident, and is in the hospital with both legs broken. B suffers severe emotional distress. A is subject to liability to B for her emotional distress. If it causes nervous shock and resulting illness, A is subject to liability to B for her illness.

> *Illustration 11:* A, who knows that B is pregnant, intentionally shoots before the eyes of B a pet dog, to which A knows that B is greatly attached. B suffers severe emotional distress which results in a miscarriage. A is subject to liability to B for the distress and for the miscarriage.

[¶ 17] Clearly, no rule of law announced in *Restatement* § 46 requires that

the conduct alleged be repetitive or recurrent before it can be considered extreme and outrageous. Nor has this court in its application of the section announced such a rule. On the contrary, in *Kanzler v. Renner,* 937 P.2d 1337, 1343 (Wyo.1997), a case involving sexual harassment in the workplace, we expressly recognized the inverse proposition: "repeated harassment ... may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Id.* (quoting *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979)).

[¶ 18] The district court was in error by reasoning that simply because the alleged extreme and outrageous conduct of this case constitutes domestic violence among intimates it somehow necessitates that the plaintiffs make a "showing of exceptional circumstances" such as a "continuing course of abuse" by the defendant. Our affirmance of this conclusion would, as a consequence, impose on a certain class of plaintiffs a burden greater than that set forth in the general rules of *Restatement* § 46 based solely on the subject matter of the complained conduct and the relationship of the parties. We decline to impose such an additional burden.

[¶ 19] Instead, a survey of this court's jurisprudence on the claim of intentional infliction of emotional distress reveals that in analyzing whether given conduct is "extreme and outrageous" this court has consistently utilized the following language found in *Restatement* § 46 cmt. d:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to

The actual "legal assault" alleged consisted of "mov[ing] toward one of the persons in a threatening manner in order to cause the person to

back away from the place where the fence was being installed...." *Id.* at 864.

exclaim, "Outrageous!" [7]

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

See e.g. *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1066 (Wyo.1986); *Kanzler v. Renner*, 937 P.2d at 1341; *Worley v. Wyoming Bottling Co. Inc.*, 1 P.3d at 628; *McCulloh v. Drake*, 2001 WY 56, ¶ 25, 24 P.3d 1162, ¶ 25 (Wyo.2001).

[¶ 20] We have further approved the *Restatement* description of the roles of both judge and jury in application of the "outrageousness" element of § 46 found in cmt. h:

Court and jury. It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

[¶ 21] Thus, we have held, "[w]hen presented with a motion for summary judgment, the court, as a matter of law, makes preliminary determinations regarding the outrageousness of the conduct and the severity of the emotional distress." *Kanzler v. Renner*, 937 P.2d at 1341; *see also Anderson v. Solvay Minerals, Inc.*, 3 P.3d 236, 241 (Wyo. 2000). However, as outlined in *Restatement* § 46 cmt. h, the court's preliminary determination as to the outrageousness of the conduct is simply to decide whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If this threshold question can be answered either in the affirmative *or* by a finding that reasonable men and women may

differ in deciding the issue, then the court must allow a jury to ultimately decide whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability. The court's gate-keeping function in this regard is solely to eliminate those frivolous and meritless claims in which no reasonable jury, composed of a fair cross-section of the community, could find the defendant's conduct sufficiently extreme and outrageous to permit recovery.

[¶ 22] Additionally, we disapprove the district court's reasoning that because appellee Fix's alleged conduct was "properly the subject of criminal and injunctive relief" that fact somehow militates against a determination that the behavior is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Restatement* cmt. d. Rather, the fact that the alleged conduct has been criminalized would appear to weigh in favor of recognition that society has determined the acts to be injurious as beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [8] *Id.*

[¶ 23] Lastly, while we generally agree with the district court's statement that, "not every *domestic altercation* constitutes extreme and outrageous conduct or results in sufficiently severe emotional impact to support a third party claim," (emphasis added) we have also consistently rejected so-called "floodgate of litigation" arguments to support denial of emotional distress claims. *See McCulloh v. Drake*, 2001 WY 56, ¶ 26, 24 P.3d 1162. When this court adopted the tort in *Leithead v. American Colloid Co.* we expressly stated, "[w]hile these problems are not to be dismissed lightly, they can certainly be solved without rejecting the action entirely. That would be the equivalent of 'employ-

---

7. Unfortunately, as we noted in *Kanzler v. Renner*, disparities in application of the tort are prevalent due in large part to the vague, subjective, and value-laden concept of "outrageousness" and the highly fact-specific inquiry necessary to decide claims under it. 937 P.2d at 1342. *See also Garcia v. Lawson*, 928 P.2d 1164, 1169 (Wyo.1996) (Golden, J., Lehman, J., dissenting).

8. Lest any should misunderstand, this court is not holding, nor even implying, that all criminal conduct is per se "extreme and outrageous" for purposes of deciding an intentional infliction of emotional distress claim. Rather, we simply note that it is a factor that cannot be used logically to militate against a finding that the conduct is "extreme and outrageous" in the context of a summary judgment proceeding on an intentional infliction of emotional distress claim.

ing a cannon to kill a flea.' " *Id.* 721 P.2d at 1065 (quoting *Nehring v. Russell,* 582 P.2d 67, 79 (Wyo.1978)). Likewise, in adopting the tort of negligent infliction of emotional distress, this court explored its concerns that the new cause of action would overly burden the judicial system and ultimately concluded with some irony, "if the only purpose of our law was to unburden the court system, then we would reach the zenith of judicial achievement simply by closing the district courts to all litigants and allowing all wrongs to come to rest on innocent victims." *Gates v. Richardson,* 719 P.2d 193, 197 (Wyo.1986).

[¶ 24] Clearly, we rejected arguments to effectively close the courts to a class of plaintiffs in *Leithead* and *Gates,* as again we do so in the instant case. We believe that simply because the alleged extreme and outrageous conduct can be labeled a "domestic altercation," does not modify the fundamental analysis undertaken in deciding the case. Regrettably, this court must recognize the prevalence, and some argue tolerance, of domestic violence within our society; however, we cannot allow judicial fear of an avalanche of cases due to the ubiquity of the conduct alleged as "extreme and outrageous" to deny a remedy to those individual parties with legitimate claims. Instead, we remain confident that lower courts are capable of properly separating those cases with merit from those without. *See generally* Merle H. Weiner, *Domestic Violence and the Per Se Standard of Outrage,* 54 Md. L.Rev. 183 (1995) and cases cited therein; Leonard Karp and Cheryl L. Karp, *Beyond the Normal Ebb and Flow ... Infliction of Emotional Distress in Domestic Violence Cases,* 28 Fam. L.Q. 389 (1994) and cases cited therein; Dr. G. Steven Neeley, *The Psychological and Emotional Abuse of Children: Suing Parents in Tort for the Infliction of Emotional Distress,* 27 N. Ky. L.Rev. 689 (2000) and cases cited therein.

[¶ 25] Viewing the evidence in the light most favorable to Brittany and Steven Bevan, we find that Fix's alleged conduct, including beating, kicking, punching, dragging by the hair, and choking Jones while screaming that he wanted to kill her, is behavior beyond mere insults, indignities and petty oppressions and which, if proved, could be construed as outrageous, atrocious, and utterly intolerable in a civilized community. At the very least, reasonable persons could differ in their conclusions as to whether Fix's conduct was extreme and outrageous. Consequently, it is for a jury to determine whether his conduct was sufficiently outrageous to result in liability.

[¶ 26] However, our analysis does not end here. Although the district court premised its grant of summary judgment to Fix solely on the first element of the children's intentional infliction of emotional distress claims, other factual issues and contentions have been raised by the appellee related to the remaining elements of the tort. We may uphold the grant of summary judgment upon any proper legal ground finding support in the record. *In re HC,* 983 P.2d 1205, 1209 (Wyo.1999); *Ahearn v. Anderson–Bishop Partnership,* 946 P.2d 417, 422 (Wyo.1997). Consequently, because the plaintiffs' failure to satisfy any single element would justify affirmance, in the interests of judicial economy and further development of the law in this area, we will address the remaining elements of the claim as applied to the instant case.

[¶ 27] Clearly, the second and third elements are met. Appellee Fix's conduct was directed toward a third person, Jenni Jones. Brittany and Steven Bevan, as her children, are members of the immediate family of Jenni Jones. As to the fourth element, appellee argues that Brittany Bevan was not personally present at the time Fix's alleged outrageous conduct took place because, when questioned by defense counsel in deposition, she indicated that she had not actually *visually observed* him beating her mother. Instead, then eight year-old Brittany stated in regard to the events two years prior: "Well, I woke up early and I heard screaming and shouting, and then I went back to sleep because I was kind of scared." When asked what happened next, she replied: "When I woke up I saw mom, I heard crying and I walked, I stepped down from the bed with the ladder, and I saw mom crying and Steven holding her and saying it's okay." When asked what else she remembered, Brittany

stated: "Bill Fix slammed her against the wall or the floor. It was either one of those because I heard a bounce."

[¶ 28] Appellee essentially urges that we reject Brittany's claim because, according to her remembrance, she was not an eyewitness to the alleged outrageous conduct. First, as a purely factual matter, it is unclear from the record precisely what Brittany Bevan observed of the violent confrontation between Fix and her mother, Jones. Jones' affidavit and sworn complaint for family violence protective order both state that Jones saw Brittany, along with her two sitters, observing the alleged beating.[9] Thus, in any event, a fact question remains as to the events actually visually observed by Brittany. More importantly, however, we do not believe that either the *Restatement* comment and caveat or our precedent on the issue support the very narrow interpretation of the "presence" element urged by appellee.

[¶ 29] This court first had occasion to address the issue when we adopted the third party intentional infliction of emotional distress claim in *R.D. v. W.H.*, 875 P.2d 26 (Wyo.1994). There we stated that most cases interpreting the presence requirement have held that "present at the time" means that the plaintiff must be present when the outrageous conduct occurs. *Id.* at 33. However, the opinion continued by citing both *Restatement* § 46 cmt. l and the caveat:

> *Conduct directed at a third person.* Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. In such cases the rule of this Section applies. *The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred.* The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford. *The Caveat is intended, however, to leave open the possibility of situations in which presence at the time may not be required.*

Cmt *l* (emphasis added). The caveat referred to in the comment states:

> The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress.

[¶ 30] Ultimately, in *R.D. v. W.H.*, this court stated that "[w]e believe that it is generally a better practice to limit recovery for intentional infliction of emotional distress to plaintiffs who were present when the outrageous conduct occurred.... [However] [w]e hold that the facts of this case place it within the narrow exception to the general rule that a plaintiff must be present when the outrageous conduct occurs in order to recover for intentional infliction of emotional distress." *Id.* at 33. There the husband and minor child of the decedent sued her stepfather and his physician for acts which they contended led to her suicide by drug overdose. While we recognized that the plaintiffs were not present either when the defendant's alleged sexual abuse of the decedent took place, or when the defendant provided the decedent with a firearm with which she attempted suicide, or when the defendant provided the decedent with the prescription narcotics by which she ultimately killed herself, we allowed the claim because "Appellant and the minor child were present in the immediate aftermath of the tragic results of Appellee's outrageous conduct, and the suicide was the final result of a continuing course of conduct instigated by Appellee." *Id.* at 33–34.

---

9. This statement is corroborated by the sitters' witness interviews conducted by the police on the morning in question.

[¶ 31] In *R.D. v. W.H.* we decided the claim by placing it outside the general rule that the claimant must be "present at the time" of the alleged outrageous conduct and therefore did not expressly address what it means to be "present" for the purposes of an intentional infliction of emotional distress claim. Accordingly, we consider it here as an issue of first impression, and we do not think that a plaintiff must necessarily visually observe the outrageous conduct to be considered "present at the time" that it occurs. "Present" is defined by *Webster's Third New International Dictionary* (1971) as "being in one place and not elsewhere; *being within reach, sight, or call or within contemplated limits;* being in view or at hand; being before, beside, with, or in the same place as someone or something." *Id.* at 1793.

[¶ 32] Therefore, we hold that in order for a plaintiff to be considered "present at the time" of the outrageous conduct for purposes of an intentional infliction of emotional distress claim, he must simply show his 'sensory and contemporaneous observance' of the defendant's acts. Consequently, the claimant is not required to have seen the outrageous acts but may still recover, without resort to the *Restatement* caveat, if he gained personal and contemporaneous knowledge of them through the use of his remaining senses. We trust this holding does more than merely reflect "the practical necessity of drawing the line somewhere," cmt. *l*, and instead strikes an appropriate balance between an actor's interest in limiting his liability to those acts committed with the reasonable foreseeability that they will cause a third-party witness emotional distress, and the interests of those claimants who have witnessed outrageous conduct directed toward their family members. *See generally,* Annotation, *Immediacy of Observation of Injury as Affecting Right to Recover Damages for Shock or Mental Anguish from Witnessing Injury to Another,* 5 A.L.R.4th 833 (1981 & Supp.2001).

[¶ 33] Applying the law we have herein set out to the instant case, we think the record discloses sufficient facts indicating Brittany's 'sensory and contemporaneous' observance of Fix's alleged outrageous conduct directed toward her mother to preclude summary judgment against her on this element. Likewise, Steven testified in deposition among other things, "I remember when Bill Fix choked my mom by a wall." The children's statements, coupled with Jones' affidavit, are sufficient to preclude summary judgment for Fix on the "presence" element of the children's claims.

[¶ 34] As to the fifth element of Brittany and Steven's claims for intentional infliction of emotional distress that they sustained severe emotional distress as a result of that conduct, appellee's brief makes many factual arguments regarding the children's memories of the events, the manner in which they describe and attribute their distress, the duration and nature of their counseling, etcetera; however, we think these factual arguments are better addressed by a jury than by this appellate court. In numerous cases we have approved the following language found in *Restatement* § 46 cmt. j defining severe emotional distress. *See Kanzler v. Renner,* 937 P.2d at 1341 (quoting cmt. j, *Restatement, Second, Torts* § 46); *Davis v. Consolidated Oil & Gas, Inc.,* 802 P.2d 840, 849 (Wyo.1990); *Leithead,* 721 P.2d at 1066–67.

Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. *Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. For example, the mere recital of the facts in Illustra-*

tion 1 above goes far to prove that the claim is not fictitious ....

Addressing the court's gate-keeping function in this regard, comment j continues:

> It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

[¶ 35] We conclude sufficient evidence of emotional distress was presented to preclude summary judgment for appellee. The facts alleging the children's changes in behavior, their own deposition testimony, the affidavit of Jones, and the deposition testimony of the two counselors and psychologist who have subsequently interviewed and diagnosed the children's disorders are more than sufficient to give rise to a genuine issue of material fact on the issue of Brittany and Steven's severe emotional distress.

[¶ 36] Lastly, we must consider whether the record discloses facts sufficient to allow a jury to reasonably conclude that Fix "intentionally" or "recklessly" caused severe emotional distress to Brittany and Steven. *Restatement* cmt. i provides:

> *Intention and recklessness.* The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, as that term is defined in § 500, in deliberate disregard of a high degree of probability that the emotional distress will follow.

The *Restatement* addresses reckless conduct in § 500, cmt. (a) (1965) thusly:

> *Types of reckless conduct.* Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.... For either type of reckless conduct, the actor must know, or have reason to know, the facts which create the risk.

Recklessness requires actual or imputed knowledge. The person who is reckless must have prior knowledge; he must know or have reason to know of facts which create a high degree of risk of harm to another, and then, indifferent to what harm may result, proceed to act.

█ [¶ 37] We find in the evidence a reasonable basis for expecting, and for Fix to have expected, such results. The assault in question was of a type and of such a nature as would ordinarily cause emotional injury to mere bystanders, even more so if they were the family members of the person being assaulted. Additionally, the fact that the witnesses are the young children of the woman assaulted would certainly cause the average person to anticipate that those children may experience severe "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea" as a result of the witnessed conduct. Cmt. j. At a minimum, we think a reasonable jury could find that by his conduct Fix "recklessly" caused severe emotional distress to Brittany and Steven Bevan on March 30, 1998.

[¶ 38] We conclude that genuine issues of material fact are present on each element of the Bevan children's claims for intentional infliction of emotional distress against Fix. Consequently, we reverse the district court's grant of summary judgment in his favor.

### Legal Malpractice

[¶ 39] Bevan contends that the district court committed error by granting summary judgment to Fix on Bevan's claim of legal malpractice, which he argues arose when Fix represented Jones against Bevan, his former client, in the couple's divorce proceeding. After analysis of this claim in its procedural posture, we affirm the district court's grant of summary judgment in favor of Fix.

[¶ 40] In *Moore v. Lubnau,* this court outlined the elements that must be satisfied by a plaintiff bringing a claim of legal malpractice. Adopting the same test that applies to medical malpractice suits, we held that, after establishing a duty, the plaintiff has the obligation to establish the accepted standard of legal care; that the attorney's conduct departed from that standard; and that his conduct was the legal cause of the injuries suffered. 855 P.2d 1245, 1248 (Wyo. 1993). We accepted that the standard of care to which an attorney would be held was, "that degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in the practice of law in this jurisdiction." *Id.* We went on to hold that a party trying to establish the standard adhered to by a "reasonable, careful and prudent" lawyer must typically use expert testimony because "most lay people are not competent to pass judgment on legal questions." *Id.* at 1249. We noted, however, that an exception exists, "when a lay person's common sense and experience are sufficient to establish the standard of care." *Id.*

[¶ 41] In the procedural posture of summary judgment, this court held that the attorney, as the moving party, first must make a prima facie showing that no genuine issue of material fact exists before summary judgment can be granted in his favor. *Id.* at 1248. To that end, the attorney, through expert testimony or affidavit, is "required to demonstrate that his conduct conformed to the accepted standard of legal care." *Id.* In *Moore v. Lubnau,* we held that the moving attorney's own affidavit was insufficient to support the grant of summary judgment in his favor. Within the opinion the court had first rejected the "locality rule" to establish the standard of care for attorneys practicing within the state reasoning that, "[a]ll attorneys must satisfy certain minimum requirements before being allowed to practice law in Wyoming. The level of knowledge required for admission to the bar does not vary from community to community. Altering the requisite degree of knowledge and care because an attorney begins practicing in a certain community makes little sense." At 1249–50. As a consequence of this holding, the court

rejected Lubnau's affidavit as insufficient because within it he only claimed to satisfy the standard of care for attorneys in Campbell County. However, a majority of the court found the deposition testimony of the then-retired judge who had presided over the underlying case sufficient to meet Lubnau's prima facie burden. The majority found that it adequately demonstrated that Mr. Lubnau met the standard of care for attorneys in Wyoming because the judge had specifically testified, "[m]y opinion is that he more than met the standards of practice in the Sixth Judicial District and in the State of Wyoming." *Id.* at 1250. Nevertheless, this court went on to state: "Ideally, the judge would have described Ms. Moore's allegations of wrongful conduct, stated the ordinary manner in which Wyoming attorneys handle each situation, and then stated whether or not Mr. Lubnau's conduct conformed to that standard." *Id.*

[¶ 42] In *Moore v. Lubnau,* the court's discussion continued, ultimately to hold: "Once Mr. Lubnau met his initial burden of proof, Ms. Moore was obligated to demonstrate through expert testimony that his conduct was not that of a reasonable Wyoming attorney. Her failure to submit countervailing expert testimony established that no genuine issue of material fact existed and that summary judgment was appropriate." *Id.* at 1251 (citations omitted).

[¶ 43] Subsequent to our decision in *Moore v. Lubnau,* this court revisited the issue of the necessity of expert testimony to support a moving attorney's motion for summary judgment on a claim for legal malpractice. In the case of *Meyer v. Mulligan,* 889 P.2d 509 (Wyo.1995), we applied the same reasoning which led to our decision in *Moore v. Lubnau,* and held that expert evidence is likewise necessary to prove proximate cause. Consequently, we found that the attorney, Mulligan, was required to provide expert evidence on the lack of proximate cause to succeed at summary judgment. *Id.* at 516. Ultimately we held, "[b]ecause Mulligan's motion for summary judgment failed to include expert evidence showing that his alleged breach was not the proximate cause of Link's or the Meyers' injury, he was not

entitled to summary judgment as against either." *Id.* at 516–17.

[¶ 44] As demonstrated by the foregoing discussion, in the instant case Fix, as the moving party, had the initial prima facie burden of presenting expert testimony either by affidavit or deposition, sufficient to demonstrate that his conduct conformed to the accepted standard of legal care and was not the proximate cause of any injury to support his motion for summary judgment. However, our review of the record including Fix's motion, as well as the memorandum of law supporting it, shows that he failed to include *any* expert evidence in support of the motion, even his own affidavit, although we note that both parties had previously designated those experts who would testify for them at trial. Clearly, under the standards we announced in *Moore v. Lubnau* and *Meyer v. Mulligan,* summary judgment in Fix's favor would generally be precluded because he had completely failed to meet his prima facie burden on the standard of care and its breach, as well as proximate cause.

[¶ 45] The district court, however, granted summary judgment to Fix on three alternate grounds. First, the court found that Fix owed no duty of care to Bevan because their attorney/client relationship had terminated. Second, the court found that if Bevan were concerned about Fix's representation of Jones, he owed a duty to object to that representation in a reasonably prompt manner, and failure to do so barred his claim. Lastly, the court found that Bevan had presented no evidence on the issue of his damages or legal injury. We will herein address these conclusions in the following order: 1) duty; 2) damages; 3) defense of waiver.

**Duty**

[¶ 46] "Whether a legal duty exists is a question of law, and absent a duty, there is no liability." *Bowen v. Smith,* 838 P.2d 186, 198 (Wyo.1992) (Brown, J., concurring); *see also Allmaras v. Mudge,* 820 P.2d 533, 536 (Wyo.1991). We agree with the district court's finding that Bevan was not a "current client" of Fix's at the time Fix undertook to represent Jones against Bevan in the divorce proceeding. Fix's representa-tion of Bevan terminated in 1992 when Bevan entered his plea and was sentenced on his criminal charge. "An attorney-client relationship does not continue indefinitely just because it has not been formally terminated." *Hiltz v. Robert W. Horn, PC,* 910 P.2d 566, 571 (Wyo.1996). However, the district court, relying on our precedent holding that an "attorney/client relationship is the essential element ... for maintenance of a legal malpractice lawsuit," *Bowen v. Smith,* 838 P.2d at 196; *see also Brooks v. Zebre,* 792 P.2d 196, 201 (Wyo.1990), concluded, *ergo* Fix owed no recognizable legal duty to Bevan. It is with this final reasoning that we cannot agree.

[¶ 47] It is true that this court has consistently rejected legal malpractice claims by "nonclient" plaintiffs of the alleged negligent attorney on the basis of several important policy considerations discussed within those decisions. *See Brooks v. Zebre,* 792 P.2d 196; *Bowen v. Smith,* 838 P.2d 186. Notwithstanding that line of precedent, the instant case cannot be pigeonholed into those analyses for the simple reason that Bevan is not a "nonclient" in relation to attorney Fix. Rather, he is, in fact, a "former client." These parties at one point in time had an attorney/client relationship.

[¶ 48] This court has not had previous occasion to squarely address the presence or scope of the duty an attorney owes to a former client and whether a breach of that duty may give rise to tort liability as legal malpractice. However, courts from other jurisdictions have consistently recognized that an attorney continues to owe a legal duty of confidentiality and loyalty to former clients, although the latter duty is more limited in nature. *See e.g. Griffith v. Taylor,* 937 P.2d 297 (Alaska 1997); *Apple v. Hall,* 412 N.E.2d 114 (Ind.App.1980); *West Virginia Canine College, Inc. v. Rexroad,* 191 W.Va. 209, 444 S.E.2d 566 (1994). These duties are considered fiduciary obligations. Moreover, the continuing duties of confidentiality and loyalty are reflected in the Wyoming Rules of Professional Conduct §§ 1.6 and 1.9 and comments thereto.

[¶ 49] Appellee argues that paragraph [6] of the "Scope" section of the Rules of Professional Conduct prevents this court from recognizing those duties embodied within them when it proclaims:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to give guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.... Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

W.R.Prof.Cond. Scope ¶ 6.

[¶ 50] We respond to this argument simply, by stressing "it is important to remember that attorneys' fiduciary obligations substantially pre-date the ethical codes." Mallen and Smith, *Legal Malpractice,* Adverse Representation § 17.3 Ethical Considerations. (5th ed. 2000) In fact, preservation of a client's confidences has been described as the "bedrock principle of the Anglo–American legal system." *Id.* at § 17.5 (quoting *In re Complex Asbestos Litigation,* 232 Cal.App.3d 572, 283 Cal. Rptr. 732 (1991)). As the Pennsylvania Supreme Court noted in its well reasoned opinion *Maritrans GP Inc. v. Pepper, Hamilton, & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1284–85 (1992):

Long before the Code of Professional Responsibility was adopted, and before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake a representation adverse to a former client in a matter "substantially related" to that in which the lawyer previously had served the client. The universally recognized statement of this rule of law is *Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.,* 216 F.2d 920 (2d Cir.1954). The *Consolidated Theatres* decision relied importantly on *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., [*113 F.Supp.265 (S.D.N.Y.1953)] supra.* Both of these cases relied on decisions of now more than

50 years standing such as *United States v. Bishop,* 90 F.2d 65 (6th Cir.1937); and *Gesellschaft Fur Drahtlose Telegraphie v. Brown,* 78 F.2d 410 (D.C.App.1935).

All of these decisions were rendered before there was a Code of Professional Responsibility. None was a disciplinary case. *Consolidated Theatres* and *United States v. Bishop* involved disqualification, which is a civil proceeding involving legal responsibilities and legal and equitable remedies. A motion for disqualification is simply an injunctive order issued in a case already pending. The *Gesellschaft Telegraphie* case involved misuse of confidences as an equitable defense to an action by an attorney to collect a fee.

The legal obligation of a lawyer to refrain from misuse of a client's confidences goes even further back, predating the ABA Canons of Professional Ethics promulgated in 1908. *See, e.g., Bowman v. Bowman,* 153 Ind. 498, 55 N.E. 422 (1899), which was also a disqualification case. The threatened violation of this duty thus has been recognized as the basis for an injunction for at least virtually a century, as stated in the leading treatise on attorneys of about the same vintage. See, 1 Thornton on Attorneys at Law, § 180 (1914), quoted above.

The Pennsylvania court went on to summarily reject the argument that appellee makes here, as do we: "The Superior Court seems to have the idea that because conduct is not a tort simply because it is a disciplinary violation, then conduct ceases to be a tort when it is at the same time a disciplinary violation. This is an inversion of logic and legal policy and misunderstands the history of the disciplinary rules." *Id.* at 1285. *See also Klemme v. Best,* 941 S.W.2d 493, 496 (Mo.1997).

[¶ 51] In addition, the Restatements have codified the duties owed to former clients in *Restatement, Third, Law Governing Lawyers* § 33 (2000). This section provides:

A Lawyer's Duties When a Representation Terminates

(1) In terminating a representation, a lawyer must take steps to the extent reasonably practicable to protect the clients interests, such as giving notice to the client

of the termination, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee the lawyer has not earned.

(2) Following termination of a representation, a lawyer must:

(a) observe obligations to a former client such as those dealing with client confidences (see Chapter 5), conflicts of interest (see Chapter 8), client property and documents (see §§ 44–46), and fee collection (see § 41);

(b) take no action on behalf of a former client without new authorization and give reasonable notice, to those who might otherwise be misled, that the lawyer lacks authority to act for the client;

(c) take reasonable steps to convey to the former client any material communication the lawyer receives relating to the matter involved in the representation; and

(d) take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation.

Comments c and d thereto state:

c. *Client confidences.* A lawyer's obligation to protect the confidences of a client, addressed in detail in Chapter 5, continues after the representation ends.

d. *Former-client conflicts of interest.* Following termination, the former-client conflict-of-interest rules apply (see § 132). On consent, see Comment *i.* hereto and § 122. On a former government lawyer, see § 133.

[¶ 52] Lastly, in recognizing the fiduciary duties owed to former clients in relation to conflicts of interest, courts regularly recite the following language from 7 Am.Jur.2d *Attorneys at Law* § 200 (1997):

Representation of interest adverse to that of former client

An attorney cannot, on termination of employment by a client, represent one whose interest in the transaction is adverse to that of the former client, or in a matter that is substantially related to the former representation. Underlying the rule that an attorney is prohibited from representing a party in a lawsuit where an opposing party is the lawyer's former client is the notion that an attorney, as part of his or her fiduciary obligation, owes a continuing duty to a former client not to reveal confidences learned in the course of the professional relationship.

[¶ 53] Accordingly, this court herein expressly recognizes the fiduciary duties of confidentiality and loyalty an attorney owes to a former client embodied in Wyoming Rules of Professional Conduct §§ 1.6 and 1.9 as a codification of the common law. Specifically, we think Rule 1.9 sets the proper limited parameters of the duty of loyalty owed to former clients:

(a) A lawyer who has formally represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation except that when the former client is a governmental entity, consent is not permitted.

[¶ 54] Absent a showing of actual disclosure of confidences in breach of the duty reflected in Rule 1.6, we think it is only those cases of adverse representation falling within Rule 1.9 which potentially meet the following test set forth in 7 Am.Jur.2d *Attorneys at Law* § 200:

The test of whether the attorney's employment is inconsistent with his or her duty to a former client is whether acceptance of the new retainer will require the attorney, in forwarding the interest of the new client, to do anything that will injuriously affect a former client in any matter in which the attorney formerly represented the client, and also whether the attorney will be called on, in the new relation, to use against a former client any knowledge or information acquired in the former relationship.

[¶ 55] Having established that Rules 1.6 and 1.9 accurately reflect the parameters of the fiduciary duties owed to former clients, we think it is obvious that a breach of those standards by the attorney

gives rise to potential civil liability to the former client. Furthermore, we hold that a breach of the attorney's duties of confidentiality and loyalty will be analyzed within the framework of a legal malpractice action.[10] The standard of care remains the same as for any other type of legal malpractice claim. The plaintiff must establish, generally through the use of expert testimony, that the defendant attorney's conduct in fulfilling his aforementioned fiduciary duties fell below "that degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in the practice of law in this jurisdiction." *Moore v. Lubnau,* 855 P.2d at 1248. While it may be more semantically accurate, in the context of a fiduciary duty, to label the requisite standard as one of conduct rather than one of care, the test remains essentially the same regardless the label.

[¶ 56] In our development of the law applicable to the analysis of an attorney's alleged breach of fiduciary duties to a former client, we wish to address one final point. In this court's application of Wyoming Rule of Professional Conduct 1.9 to disciplinary actions and disqualification motions we have followed the majority of courts and adopted the most prophylactic rule that the presumption of disclosure of confidences is irrebuttable with respect to the individual attorney when the interests of the previous client are adverse to a client whom the attorney is now representing. *Carlson v. Langdon,* 751 P.2d 344, 349 (Wyo.1988). We noted, "the irrebuttable presumption with respect to the individual attorney offers greater assurance that confidential information will be protected and assists in avoiding any appearance of impropriety. It also protects the former client from disclosing the very confidential information he seeks to protect in order to

establish justification for disqualification in the later proceeding." *Id.*[11]

[¶ 57] As a consequence of the above holding, we further held in *Carlson v. Langdon,* the focus of the inquiry is not whether confidential information was disclosed but on whether the matters are related in some substantial way. *Id.* This court went on to adopt the so-called "factual context" approach to determining this issue. We said, "[i]f the two matters have common facts, the attorney is in a position to receive confidential information which possibly could be used to the detriment of the former client in the later proceeding." *Id.* (citing *Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85 (9th Cir.1983)).

[¶ 58] In regard to legal malpractice, some courts choose to apply the same presumptions and substantial relationship tests to analyze negligence claims under Rule 1.9 that they apply to disciplinary and disqualification cases. *See e.g. Damron v. Herzog,* 67 F.3d 211 (9th Cir.1995); *West Virginia Canine College, Inc. v. Rexroad,* 191 W.Va. 209, 444 S.E.2d 566 (1994). However, this approach has been criticized in the context of a professional negligence claim because, "the presumption that follows for purposes of disqualification lacks the causation element appropriate for a damage action." Mallen and Smith, *Legal Malpractice,* Adverse Representation, Action for Legal Malpractice § 17.24. In other words, these critics argue if the plaintiff client may simply show that his attorney represented another client against him in a substantially related matter and thus the irrebuttable presumption arises that confidentiality was breached, the plaintiff client's burden of proving proximate cause and legal injury has been unfairly lifted. On the other hand, we think requiring the plaintiff client to waive his privilege and self-disclose all the confidences he made to the

---

**10.** Some courts classify suits alleging a breach of these duties as claims for breach of fiduciary duty. *See e.g. David Welch Co. v. Erskine & Tulley,* 203 Cal.App.3d 884, 250 Cal.Rptr. 339 (1988). However, this court has followed those courts holding that such claims are subsumed into a claim of legal malpractice. *Peterson v. Scorsine,* 898 P.2d 382, 389 (Wyo.1995). In general, the primary practical result of classifying the claim is to determine the applicable statute of

limitations. *See generally,* Anderson & Steele, *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle,* 47 S.M.U. L.Rev. 234 (1994).

**11.** This court did not adopt the second-stage irrebuttable presumption for those cases involving imputed knowledge to members of the attorney's firm.

attorney during the representation to try to prove that they may have been used against him in the subsequent matter would seem to make any resolution of the case in his favor a pyrrhic victory. In addition, the attorney now represents a new client; the privilege that attaches to that relationship may make it exceedingly difficult for the former client to discover precisely whether and/or how the attorney has used his confidential information to the benefit of the new client and detriment of the former client.

[¶ 59] Our research reveals that at least one court has taken a middle road in attempting to balance the competing burdens and policies necessary to decide this issue in the context of summary judgment for legal malpractice. *Chrysler Corp. v. Carey*, 5 F.Supp.2d 1023 (E.D.Mo.1998) (*affirmed* 186 F.3d 1016 (8th Cir.1999)). The case pitted Chrysler Corporation against two former attorneys who formerly worked at a law firm that represented Chrysler in defending various class action lawsuits involving alleged defects in certain Chrysler vehicles. While at this law firm, both attorneys did a significant amount of work on several of these lawsuits. After leaving the firm, the two attorneys formed their own firm and agreed to serve as plaintiff's counsel in a putative class action against Chrysler, albeit involving an alleged defect different from the defects claimed to exist in the cases on which they had worked while at their former firm. Chrysler, claiming that the attorneys' conduct was not only unethical but tortious, filed suit for breach of fiduciary duty. The issues of breach, causation, and damages were fiercely disputed, and both sides moved for summary judgment. Chrysler contended that a breach of duty of confidentiality should be presumed if the court found that the former and latter lawsuits were "substantially related" within the meaning of Rule 1.9. They also argued that because the attorneys could not possibly have "compartmentalized" the confidential information to which they had access at the former firm in deciding to bring the subsequent lawsuit, a reasonable inference should be drawn that they did indeed use it. The court ultimately decided that sufficient evidence had been presented to give rise to a genuine issue of material fact

on the issues of breach, causation and damages because when all facts were viewed in the light most favorable to one party or the other reasonable minds might differ.

Certainly, a reasonable juror might find from all the evidence and inferences therefrom that [the attorneys] in fact used confidential information. On the other hand, because Chrysler can point to no particular item of confidential information used, a reasonable juror might find no breach. The Court does not believe that under Missouri law a breach is presumed or somehow established as a matter of law if the matters are "substantially related" under Rule 1.9. Instead, the evidence of a relationship, or lack thereof, between the cases are facts that the jury may consider in determining whether it should draw an inference that confidential information was used. Neither party is entitled to summary judgment.

For the same reasons, the Court believes that a reasonable juror could find or not find that defendants breached their duty of loyalty to Chrysler. The undisputed facts in this case show that [the attorneys] elected to prosecute a class action product liability lawsuit against Chrysler within a year after leaving a firm where they had performed significant work defending Chrysler in product liability class actions. Given their intimate familiarity with Chrysler's approach to vehicular defect class actions, a reasonable juror could find that it was a breach of loyalty for them to turn around and bring such a lawsuit against Chrysler. Again, neither party is entitled to summary judgment. *Id.* at 1033–34.

[¶ 60] We agree that this is the correct analysis in regard to the application of Rule 1.9 to legal malpractice claims for breach of fiduciary duty and hereby adopt it. Unlike cases involving disciplinary action or disqualification, in a claim for legal malpractice, a showing of a "substantial relationship" between the matter for which the attorney represented the former client plaintiff and the subsequent materially adverse representation does not give rise to an irrebuttable presumption that confidentiality has been

breached. It may however, if supported by the evidence, allow a reasonable juror to draw the inference that the client's confidences have been used against him in contravention of the attorney's continuing duties of confidentiality and loyalty.

[¶ 61] In the instant case, neither party has developed the record nor sufficiently briefed and analyzed the issues to allow us to apply the law to the facts and circumstances before us. It is conceivable, however, that an attorney who represents a client on a charge of domestic battery could become privy to facts sufficiently common to those involved in a subsequent dissolution of marriage and custody determination proceeding to give rise to the inference that confidential information may have been used to the detriment of the former client in the later proceeding thus breaching the attorney's duties of confidentiality and loyalty.

### Damages

 [¶ 62] The district court in granting summary judgment to Fix found "there is no evidence in the record which demonstrates how Fix's conduct as an attorney caused [Bevan] harm. Simply asserting that Fix's conduct was improper or even immoral is insufficient to support a claim for malpractice." We agree with the district court's conclusion and affirm the grant of summary judgment to Fix on this basis. Appellant Bevan presented no evidence of any injury or damages arising from Fix's subsequent representation of Jones. He has not alleged any facts indicating that the outcome of his divorce proceeding would have been more favorable had another attorney represented his wife Jones. He seems to argue that the breach of loyalty and presumed confidentiality caused through the adverse representation by Fix in a substantially related matter is inherently injurious to him as the former client. That may very well be accepted as true in the context of a disciplinary proceeding where the focus is solely upon the attorney's alleged violation of disciplinary rules because such a violation is presumed to not

only harm the attorney's clients but also the judicial process, as well as the public's perception of the legal profession. However, in a suit for negligence, the plaintiff must prove all elements. Without legal injury or damages, for what is he to be compensated?

[¶ 63] In the case of *Chrysler v. Carey*, discussed *infra*, Chrysler claimed as damages legal expenses paid to a second law firm in connection with that firm's investigation of the link between the defendant attorney's firm and other firms in filing the lawsuit against Chrysler. They also claimed attorney fees and expenses incurred in defending the lawsuit filed by the defendant attorneys. Here, Bevan claimed no damages and presented no evidence of injury; thus the grant of summary judgment against him was appropriate because there is no genuine issue of material fact present on that necessary element.

### Waiver

[¶ 64] Finally, we consider the district court's conclusion that Bevan's failure to seek disqualification of Fix in his representation of Jones constitutes a waiver and thus bars his subsequent claim for legal malpractice. The district court relied on our decision *Bowen v. Smith*, 838 P.2d 186 (Wyo.1992). While we did discuss the issue in the foregoing case, it was clearly as *dicta* because the case was resolved on the basis that no attorney/client relationship had ever existed between the minority shareholder plaintiffs and the defendant attorneys who had represented the corporation. Nonetheless, we did state in that opinion that, "the minority shareholders could have objected to the continued representation of Springer Jones and his company, Squaw Mountain [the majority shareholders], in the division litigation [a subsequent action in which minority shareholders sued majority shareholders for division of proceeds from settlement of initial litigation] if they had so chosen. Clearly, that effort was not made and any complaint either in ethical challenge or damage complaint is waived by intentional choice, disinterest or inactivity." [12] *Id.* at 194.

---

12. To the extent the statement seems to imply that the former client's failure to seek disqualification of the attorney during the subsequent

adverse representation waives any "ethical challenge" i.e. disciplinary action, it is an unfortu-

[¶ 65] The prior failure of the former client to seek disqualification of the attorney in the adverse representation has become a common defense for purposes of a legal malpractice claim. Several courts in particular cases have recognized this failure as a waiver of the alleged conflict. *See Wilbourn v. Stennett, Wilkinson & Ward,* 687 So.2d 1205 (Miss.1996). This court has determined waiver to be "the intentional relinquishment of a known right and must be manifest in some unequivocal manner." *Baldwin v. Dube,* 751 P.2d 388, 392 (Wyo.1988); *see also Jackson State Bank v. Homar,* 837 P.2d 1081, 1086 (Wyo.1992). We have held that "the constituents of waiver are identified as: (1) an existing right; (2) knowledge of that right; and (3) an intent to relinquish it." *Ramirez v. Metropolitan Life Ins. Co.,* 580 P.2d 1136, 1138 (Wyo.1978); *Jackson State Bank,* at 1086.

 [¶ 66] Clearly, under the Rules of Professional Conduct, the onus is on the attorney to consult with his former and current clients and seek their consent to any subsequent adversarial representation. *See* Wyo. R.Pro.Cond. 1.9(a). Nevertheless, in the context of legal malpractice, we think it appropriate to find that the former client may have waived the conflict of interest by failing to disqualify the attorney, provided the attorney, as the party asserting the defense, meets his burden of showing the former client had the requisite knowledge of the right and intended to relinquish it. We do not find the client's failure to seek his former attorney's disqualification an automatic defense precluding judgment for malpractice in favor of the client as a matter of law. Rather, the issue will have to be decided on a case-by-case basis. Regrettably, we think the source of many of these problems is an attorney's "failure to have adequate systems to identify former clients and the subject of their prior representation." Mallen and Smith, *Legal Malpractice,* § 17.24. Ultimately, it may be appropriate that the attorney,

nate overbroad statement of the law and is

as the party most able to prevent the injury, bear the risk for this failure.

[¶ 67] In the case of *Wilbourn v. Stennett, Wilkinson & Ward,* the defendant law firm had itself sought "qualification" by the court in the underlying litigation. When the court asked Wilbourn if he wanted the law firm disqualified, he responded negatively. He stated that after three years in federal court the firm had already breached the confidences, and to disqualify the firm would hinder the trial. 687 So.2d at 1217. The court deciding his malpractice claim found that Wilbourn had waived the firm's disqualification and was thus barred from asserting his claim of negligence against them. We cannot say that the facts before us are similar to those in *Wilbourn.* Unfortunately, the record is not sufficiently developed for us to apply the law herein set out to the instant case, nor is it necessary for us to do so as we have affirmed the district court's judgment on other grounds.

### *CONCLUSION*

[¶ 68] We reverse and remand the summary judgment granted Fix on the Bevan children's claims for intentional infliction of emotional distress for further proceedings. We find within the record genuine issues of material fact necessitating jury determination. On Bevan's claim of malpractice against his former attorney Fix, we recognize the cause of action and have addressed how it is to be applied, but find that Bevan presented no evidence on the issue of his injury or damages; thus Fix is entitled to judgment as a matter of law.

[¶ 69] Affirmed in part, reversed in part and remanded.

hereby overruled.